IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| DAVID HODGE and | ) | |
| PATRICIA HODGE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.    13-05131-CV-SW-REL |
| | ) | |
| SPRINGLEAF FINANCIAL | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFFS' SECOND MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

Before the Court are the parties' cross-motions for summary judgment. For the following reasons Plaintiffs' second motion for summary judgment will be denied and Defendant's second motion for summary judgment will be granted.

## I.    BACKGROUND

On September 22, 2015, I denied Plaintiffs' original motion for summary judgment and granted in part and denied in part Defendant's original motion for summary judgment (Doc. No. 55). As a result of this ruling, Plaintiffs' contractual indemnity claim remained. The parties have both filed second motions for summary judgment on this claim (Doc. Nos. 71, 80). Following briefing, the parties withdrew their request for a bench trial and requested that I resolve the case based on their pending motions (Doc. No. 88).

## II.    STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The key to determining whether summary judgment is proper is ascertaining whether a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party.  Am. Acad. of Family Physicians v. United States, 75 A.F.T.R.2d 95-1709 (W.D. Mo. 1995), aff'd 91 F.3d 1155 (8th Cir. 1996).  The party moving for summary judgment has the burden of proving that these requirements for summary judgment have been met.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

In a summary judgment analysis, a court must first consider whether there are any issues of fact.  If the only issues are issues of law, then summary judgment is appropriate.  Disesa v. St. Louis Cmty. Coll., 79 F.3d 92, 94 (8th Cir. 1996).  If issues of fact are raised, a court must consider whether these issues are material to the outcome of the case.  Materiality is identified by the substantive law that is to be applied.  Anderson, 477 U.S. at 248.  Factual disputes that are collateral to the substantive law will not preclude summary judgment.  Id.

In addition to the requirement that a dispute of fact be material, the dispute must also be genuine.  A dispute of fact is considered genuine if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party.  Id. at 249. When considering a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor.  Id. at 255.  If the evidence

submitted by the non-moving party is merely colorable or is not significantly probative, then summary judgment may be granted.   Id. at 249-50.

Where the party moving for summary judgment does not bear the burden of proof at trial, that party must show "that there is an absence of evidence to support the non-moving party's case."   Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).   This burden is met when the moving party identifies portions of the record demonstrating an absence of a genuine issue of material fact.   Id. at 323.   If the moving party meets the requirement, the burden shifts to the non-moving party who must set forth specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 248.   The trial judge then determines whether a trial is needed -- "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."   Id. at 250.

### III.   STIPULATED FACTS

Below are the facts that have been stipulated to by the parties (Doc. Nos. 53, 78).

1. Defendant Springleaf is a Delaware Corporation who maintains an office for the transaction of its normal and customary business at 2903 E. 4th Street, Joplin, Missouri.

2. Defendant Springleaf's principal place of business is in Evansville, Indiana.

3. Defendant Springleaf currently occupies the premises at 2903 E. 4th Street, Joplin, Missouri pursuant to a Lease Agreement.

4. Plaintiffs are residents and citizens of the State of Missouri.

5. The Lease Agreement giving rise to this action concerns real property located at 2903 E. 4th Street, Joplin, Missouri.

6.  On September 21, 2004, Mizzou Realty Company, LLC leased the premises at 2903 E. 4th Street, Joplin, Missouri to American General Financial Services, Inc. ("AGFS").

7.  AGFS executed a Lease Agreement dated September 21, 2004 with Mizzou Realty Company, LLC concerning the premises at 2903 E. 4th Street, Joplin, Missouri. (the "Lease Agreement").

8.  Mizzou Realty Company, LLC ("Mizzou Realty") was, at all times relevant to this action, the owner of the premises located at 2903 E. 4th Street, Joplin, Missouri.

9.  The Lease Agreement was for a term of sixty (60) months beginning on December 1, 2004 and ending on November 30, 2009.

10. In pertinent part, Paragraph 8.B of the Lease Agreement states:

    Tenant agrees, at its sole cost and expense, (1) to make all necessary repairs to the interior of the Premises, including regular and ordinary maintenance and replacement of filters two (2) times per year, to heating, air conditioning, gas, electrical and plumbing fixtures serving said Premises exclusively and the sewer serving said Premises; (2) to accept and pay for the billing of reasonable charges of a reputable HVAC contractor that Landlord shall engage to service and maintain the HVAC system every six (6) months during the term of the lease . . . .

11. Paragraph 7.A of the Lease Agreement states:

    Tenant covenants that they will keep the Premises in a clean, safe and healthful condition, and will use the same in a careful and proper manner; that they will not violate any present or future laws, statutes, ordinances, requirements or regulations of any constituted governmental authority with respect to the use, occupancy and care of said Premises and the conduct of Tenant's business therein; and that Tenant will not permit the Premises to be used for any unlawful or immoral purposes. Tenant shall use the Premises as a business location, respecting the rights and privileges of other building tenant(s), if any. Tenant shall not commit or allow any waste on said Premises or a nuisance or other acts or things which might disturb the quiet enjoyment of any other tenant in the

building. Tenant shall use the demised premises solely for the purpose of financial consumer lending and related services.

12.     Paragraph 17.A of the Lease Agreement states:

> Tenant shall indemnify and hold Landlord, its employees, subsidiaries, agents, affiliates, successors and assigns, harmless from and against any and all claims, damages, expenses or liability arising from (1) any breach or default of Tenant under this Lease; or (2) any injury to person or property, during the Lease Term, occasioned wholly or in part due to any act or omission of Tenant, Tenant's agents, contractors, or employees.

13.     Defendant Springleaf is the legal successor to AGFS.

14.     Defendant Springleaf assumed AGFS's rights and obligations under the Lease Agreement.

15.     The Lease Agreement was in full force and effect during the entire period David Hodge was employed as AGFS's Branch Manager at the 2903 E. 4th Street location.

16.     Plaintiff David Hodge was an employee of AGFS or one of its affiliates.

17.     Plaintiff David Hodge was the branch manager for AGFS at its location at 2903 E. 4th Street, Joplin, Missouri from September 10, 2007 to July 21, 2008.

18.     The thermostat at the 2903 E. 4th Street location did not always work properly the entire time David Hodge was employed at the 2903 E. 4th Street location.

19.     The thermostat at the 2903 E. 4th Street location did not always work properly prior to the discovery of the dislodged flue pipe.

20.     Plaintiff David Hodge informed representatives of AGFS that the thermostat servicing the premises at 2903 E. 4th Street was not always in working order.

21.   AGFS knew the thermostat at 2903 E. 4th Street did not always work properly and took no action to repair the thermostat prior to the discovery of the dislodged flue pipe.

22.   On or about November 14, 2007, Mark Rhine (a handyman retained by AGFS) was on the 2903 E. 4th Street premises to generate an estimate for repairs requested by the branch manager -- David Hodge.

23.   Mr. Rhine discovered that the furnace flue pipe serving 2903 E. 4th Street was dislodged. Mr. Rhine reattached it and notified AGFS.

24.   On November 16, 2007, AGFS arranged for Gunlock Heating & Air Conditioning to reattach the flue pipe serving 2903 E. 4th Street with screws.

25.   AGFS was billed and paid for the maintenance performed by Gunlock Heating & Air Conditioning on the furnace and flue pipe serving 2903 E. 4th Street.

26.   Prior to the discovery of the dislodged flue pipe, Mizzou Realty never hired a contractor or any firm or person to service or inspect the furnace serving the 2903 E. 4th Street location while AGFS was the tenant.

27.   From the inception of the Lease Agreement to at least, November 14, 2007, AGFS did not hire any contractor or firm or person to service or inspect the HVAC System serving the 2903 E. 4th Street location.

28.   Prior to the discovery of the dislodged flue pipe, Mizzou Realty never billed or invoiced AGFS for any maintenance or service to the HVAC system serving 2903 E. 4th Street.

29.   Prior to November 14, 2007, AGFS was unaware of any inspection of the HVAC system serving 2903 E. 4th Street.

30. Laura L. Miller was an employee of and employed by AGFS or Defendant Springleaf during the time period spanning from November 1, 2007 to at least December 1, 2008.

31. Laura L. Miller was employed as AGFS's Maintenance Coordinator in the Facilities Management division of AGFS from November 1, 2007 to at least December 1, 2008. Ms. Miller is not now, nor has she ever been, an attorney.

32. AGFS's Facilities Management division was responsible for arranging for maintenance at AGFS's branch locations in accordance with the terms of the lease agreements pertaining to those branch locations.

33. Laura L. Miller's email address assigned by AGFS during the time period spanning from November 1, 2007 to at least December 1, 2008 was Laura_Miller@agfinance.com.

34. On November 16, 2007—two days after Mark Rhine discovered the disconnected flue pipe—Laura L. Miller stated in an email, "As you will see, [AGFS is] responsible for repairs to the HVAC unit."

35. David and Patricia Hodge filed a lawsuit (the "Personal Injury Suit") against Mizzou Realty and other entities claiming personal injuries to David Hodge from carbon monoxide exposure sustained at 2903 E. 4th Street.

36. Prior to filing the Personal Injury Suit, Plaintiff David Hodge made a workers' compensation claim to AGFS for personal injuries from exposure to carbon monoxide while occupying the premises located at 2903 E. 4th Street.

37. AGFS was not a defendant in the Personal Injury Suit.

38. The Personal Injury Suit asserted claims against Mizzou Realty for breaching its duties as a landowner to persons occupying or otherwise present on the land. Specifically, David and Patricia Hodge alleged that Mizzou Realty and the other named defendants were negligent in failing to properly maintain the leased premises at 2903 E. 4th Street.

39. The door to the furnace room lacked adequate venting to the extent that only nine percent of the combustion and dilution air required by code was reaching the furnace room.

40. The inadequate amount of combustion and dilution air reaching the furnace room resulted in incomplete combustion and excess carbon monoxide in the flue gases.

41. As a result of the disconnected flue pipe, carbon monoxide was likely drawn back into the 2903 E. 4th Street building.

42. On February 15, 2012 Mizzou Realty demanded AGFS or its successor indemnify Mizzou Realty for the claims made by David and Patricia Hodge in the Personal Injury Suit.

43. Mizzou Realty's demand for indemnity specifically referenced paragraphs 8.B, 7.A, and 17.A as the provisions of the Lease Agreement providing the basis for indemnity.

44. Springleaf denied Mizzou Realty's request for indemnity on April 3, 2012.

45. On March 26, 2013, Mizzou Realty and its insurer (State Farm Fire and Casualty Company) resolved the negligence claims asserted against Mizzou Realty in the Personal Injury Suit for the payment of $300,000 and signed a Settlement Agreement.

46.     The terms described in the Settlement Agreement were reached through mediation between Mizzou Realty (and its members), State Farm Fire and Casualty Company, and David and Patricia Hodge.

47.     Neither Mizzou Realty nor State Farm Fire and Casualty Company admitted liability for any of the injuries alleged by David and Patricia Hodge. Specifically, the parties to the Settlement Agreement resolving the Personal Injury Suit agreed that:

> the payment recited herein is not to be construed as an admission liability on the part of any person herein or hereby released; liability being expressly denied by each of them, and that the payments recited herein is made solely to avoid further expenses connected with additional investigation and litigation.

48.     In addition to paying Plaintiffs $300,000, Mizzou Realty (and its members) agreed to assign to Plaintiffs "any and all interest they may have in any indemnity claim, whether contractual or non-contractual, arising out of the Lease Agreement dated September 21, 2004 against [Springleaf], but [made] no representation as to the viability, quality or even existence of such indemnity claim."

49.     The pictures labeled as Exhibits A, B, and C were taken by Plaintiffs' counsel -- Kirk Presley -- in September 2009.

50.     Larry Phillips -- one of the witnesses Plaintiffs have identified as a retained expert in this action -- provided an expert report detailing his opinions related to this action (Phillips' "Expert Report"). Phillips' Report is dated March 4, 2013.

51.     In his Expert Report, Phillips indicates that he visually inspected the HVAC unit serving 2903 E. 4th Street, Joplin, Missouri (Springleaf's "Joplin Location").

52. Phillips' inspection of Springleaf's Joplin Location occurred on or about February 20, 2013.

53. Prior to his inspection of Springleaf's Joplin Location, Phillips received copies of Exhibits A, B, and C, along with other photographs from Plaintiffs' counsel. Phillips references in his Expert Report that he reviewed photographs provided to him. All of the photographs provided to Phillips prior to his inspection of Springleaf's Joplin Location were taken by Plaintiffs' counsel -- Kirk Presley -- in September 2009.

54. During his inspection of Springleaf's Joplin Location, Phillips took additional photographs of the interior of Springleaf's Joplin Location.

55. On November 25, 2014, Phillips executed an addendum to his Expert Report (Phillips' "Addendum").

56. In his Addendum, Phillips indicates that he relied, *inter alia*, on photographs of the interior of Springleaf's Joplin Location in reaching the conclusions contained in his Report. Exhibits A, B, and C were among the photographs that Phillips relied on in reaching the conclusions contained in his Report.

57. On December 28, 2015, Phillips executed an affidavit, which Plaintiffs' provided to Springleaf with their January 8, 2016 Amended Expert Disclosures (Phillips' "Affidavit").

58. Phillips attached Exhibits A and B to his Affidavit and indicated that those exhibits were fair and accurate depictions of the room in which the HVAC unit is located at Springleaf's Joplin Location at the time of Phillips' inspection of Springleaf's Joplin Location.

59. Phillips attached Exhibit C to his Affidavit and indicated that Exhibit C is a fair and accurate depiction of the ceiling tiles in the room in which the HVAC unit is located at Springleaf's Joplin Location at the time of Phillip's inspection of Springleaf's Joplin Location.

60. Tyler Smith was the branch manager at Springleaf's Joplin Location from 8/29/2005 to 8/10/2007.

61. Tyler Smith was the branch manager at Springleaf's Joplin Location immediately preceding David Hodge.

62. To change the filters to the furnace at Springleaf's Joplin Location, a person must be in the same room as the furnace.

## IV.   UNCONTROVERTED FACTS

Below, typed in bold, are the facts offered by the parties that I find to be uncontroverted by the record before me.

1. Exhibit C depicts the ceiling tiles in the furnace room at the time Mark Rhine discovered the dislodged flue pipe.

   Defendant controverts this proposed fact, citing the following testimony from Mr. Rhine's deposition:

   Q:  Did you see any sooting or signs of discoloration on either the vent stack or the ceiling tile?
   A.  Not that I recall.

   (Rhine deposition, 14:18-21).

   In response, Plaintiffs cite additional testimony from Mr. Rhine's deposition:

> Q: And was the tile similar to the tile that's shown in Exhibit –
> A: Yes.
> Q: What is that number?
>    MR. PRESLEY: 23.
> Q: (By Mr. Mitchell) – 23?
> A: Yes.
> Q: It was stained?
> A: Yes.
> Q: Did you take that picture?
> A: No, sir.
> Q: All right.   Do you know when that picture was taken?
> A: No, sir.
> Q: But from where you stood, it was clearly visible to you that there was a gap between the two vents?
> A: Yes, sir.
> Q: All right.   And so anybody looking up at that stained tile would be able to see that gap?
> A: Yes, sir.

(Rhine deposition 27:3-24). Due to the differing testimony, I find this fact to remain controverted.

**2.      [Plaintiffs' expert Larry Phillips opined that] the discoloration and staining of the ceiling tiles in Exhibit C was caused by the leakage of flue gases.**

Defendant objects to this proposed fact on grounds that it is a "purported expert opinion," rather than a fact.   I need not address Defendant's arguments regarding the weight that should be given to Mr. Phillips' opinions since this proposed fact is not material to the outcome of the case.

3.      **[Plaintiffs' expert Larry Phillips opined that] once the flue pipe was reattached there would have been no further staining of the ceiling tiles in Exhibit C from flue gases.**

Defendant objects to this proposed fact on grounds that it is a "purported expert opinion," rather than a fact.   I need not address Defendant's arguments regarding

the weight that should be given to Mr. Phillips' opinions since this proposed fact is not material to the outcome of the case.

4. **Defendant Springleaf has no records of either it or someone on its behalf performing any service of any kind on the HVAC system.**

Defendant does not dispute this fact.

5. **Springleaf has asserted that:**

**[I]t is the responsibility of Springleaf's branch managers to identify the maintenance, service and repair needs of their respective branch locations, and ensure that such maintenance, service, and repair needs are met. Springleaf believes (in good faith) that its branch managers fulfilled their obligations…**

Defendant does not dispute this fact.

6. **From December 1, 2004 to the date Mark Rhine discovered the dislodged flue pipe, Defendant Springleaf did not have any written policies in place regarding the purchase or changing of filters for the furnace at the Joplin location.**

Defendant does not dispute this fact.

7. **Defendant Springleaf has no records that from December 1, 2004 to the date Mark Rhine discovered the dislodged flue pipe that it hired a contractor to change the filters to the furnace at the Joplin location.**

Defendant objects to this fact on grounds that the citation does not support the statement, but admits it no longer has any records.

8. **Defendant Springleaf has no records that its employees, agents, or independent contractors changed the filters to the furnace at the Joplin location from December 1,**

**2004 to the date Mark Rhine discovered the dislodged flue pipe.**

Defendant does not dispute this fact.

9. **Defendant Springleaf has no records that its agents, employees or independent contractors purchased filters on Defendant Springleaf's behalf from December 1, 2004 to the date Mark Rhine discovered the dislodged flue pipe to be used in the furnace at the Joplin location.**

Defendant does not dispute this fact.

10. **Tyler Smith stated he had no responsibilities for the maintenance of the Joplin location.**

Defendant does not dispute this fact.

11. **Tyler Smith does not remember ever changing the filters to the furnace serving the Joplin location or Defendant Springleaf hiring anyone to change the filters to the furnace.**

Defendant does not dispute this fact.

12. **David Hodge was never advised during his manager training or during his transition to manager at the Joplin branch that he was required to change the filters to the furnace.**

The evidence cited by Defendant does not controvert this fact.

13. **David Hodge was never advised that he was required to perform maintenance on the furnace at the Joplin location.**

The evidence cited by Defendant does not controvert this fact.

14.     **David Hodge understood his responsibility as a branch manager for maintenance at the Joplin location was to call his District Manager.**

        The evidence cited by Defendant does not controvert this fact.

15.     **Defendant Springleaf never informed Mizzou Realty Company, LLC of the broken thermostat at the Joplin location.**

        Defendant does not dispute this fact.

16.     **The dislodged flue pipe was visible to an individual standing at the open door of the furnace room.**

        Defendant controverts this proposed fact in part on grounds that the dislodged flue pipe was visible from the door to the furnace room after Mr. Rhine discovered the dislodged pipe and showed Mr. Hodge.  Defendant does not cite any evidence to the contrary.   I find this fact to be uncontroverted.

17.     **Prior to the date Mark Rhine discovered the dislodged flue pipe, David Hodge had never been inside the furnace room or opened the door to the furnace room.**

        Defendant does not dispute this fact.

18.     **At the time David Hodge began his employment as branch manager at the Joplin location, banker's boxes were stacked in front of the door to the furnace room.**

        Defendant does not dispute this fact.

19.     **Prior to Mark Rhine entering and discovering the dislodged flue pipe in the furnace room, the banker's boxes stacked in front of the door to the furnace room had to be moved.**

Defendant does not dispute this fact.

20. **Dustin Coleman – a witness Springleaf has identified as a retained expert in this action – provided an expert report detailing his opinions related to this action.**

Plaintiff does not dispute this fact.

## V.    *LEGAL ANALYSIS*

Both parties affirmatively seek summary judgment on the remaining contractual indemnity claim.    My September 22, 2015 Order stated, in relevant part:

> Analysis of Plaintiffs' contractual indemnification claim is governed by the language of the indemnification agreement between Mizzou Realty and Defendant Springleaf and what, if any, duties Defendant Springleaf contracted to perform.    The indemnification provision states:
>
>> Tenant shall indemnify and hold Landlord, its employees, subsidiaries, agents, affiliates, successors and assigns, harmless from and against any and all claims, damages, expenses or liability arising from (1) any breach or default of Tenant under this Lease; or (2) any injury to person or property, during the Lease Term, occasioned wholly or in part due to any act or omission of Tenant, Tenant's agents, contractors, or employees.
>
> The parties' relevant duties are set forth in paragraphs seven and eight of the lease agreement.    In Paragraph 7(A), Defendant Springleaf expressly agreed to "keep the Premises in a clean, safe and healthful condition."    Paragraph 8(B) of the lease agreement provides the following with regard to repairs:
>
>> Tenant agrees, at its sole cost and expense, (1) to make all necessary repairs to the interior of the Premises, including regular and ordinary maintenance and replacement of filters two (2) times per year, to heating, air conditioning, gas, electrical and plumbing fixtures serving said Premises exclusively and the sewer serving said Premises; (2) to accept and pay for the billing of reasonable charges of a reputable HVAC contractor that Landlord shall engage to service and maintain the HVAC system every six (6) months during the term of the lease . . . .

Plaintiffs argue that Defendant Springleaf breached these provisions by failing to conduct regular and ordinary maintenance on the furnace and by failing to keep the premises in a clean, safe and healthful condition (Doc. No. 37). Conversely, Defendant Springleaf argues that the indemnity provision does not require it to indemnify Mizzou Realty for Mizzou Realty's <u>own</u> negligence and that the lease agreement expressly reserved the duty to maintain the HVAC system to Mizzou Realty (Doc. Nos. 45, p. 24-28; 46, p. 15-16; 49, p. 1-10).

Interpretation of a contract is a question of law. <u>Anchor Centre Partners v. Mercantile Bank</u>, 803 S.W.2d 23, 32 (Mo. banc 1991); <u>Systemaire, Inc. v. St. Charles County</u>, 432 S.W.3d 783, 787 (Mo. App. 2014). "The cardinal rule of contact interpretation is to ascertain the parties' intentions and to give effect to that intention." <u>Systemaire</u>, 432 S.W.3d at 787 (citation omitted). Only when the contract is ambiguous should the court look to extrinsic or parol evidence in determining intent. <u>Id</u>. Ambiguity exists "where, from the four corners of the contract alone, it appears that the terms are susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms." <u>Id</u>. (citation omitted).

Here, Defendant's argument that Mizzou Realty was exclusively responsible for maintenance of the HVAC system is inconsistent with the plain language of the lease agreement. Paragraph 8(A) provides that (1) Defendant Springleaf contracted to perform "regular and ordinary maintenance" to heating fixtures and (2) Mizzou Realty contracted to have the HVAC system "serviced and maintained" every six months. I interpret this paragraph to obligate Defendant Springleaf for day-to-day type issues and Mizzou Realty to perform preventative, semi-annual maintenance.

Plaintiffs want the Court to make the inference that Defendant Springleaf would have discovered the dislodged flue pipe if it had performed regular and ordinary maintenance on the heating fixtures. The facts before me, however, do not allow me to determine whether a breach of this duty occurred. There is no evidence concerning Defendant Springleaf's performance of regular and ordinary maintenance. The parties merely stipulated that from the inception of the lease until November 14, 2007, Defendant Springleaf "did not hire a contractor or firm or person to service or inspect the HVAC System." This does not mean that "regular and ordinary maintenance" was not performed or that circumstances giving rise to the necessity of service even occurred. Additionally, there is no evidence regarding the physical characteristics of the furnace, including whether the flue pipe was in a location that could be observed while performing "regular and ordinary maintenance." As a result, summary judgment on Count II -- for either party -- is not appropriate.

(Doc. No. 55).

Central to that order was my interpretation of the respective duties that the lease established for Mizzou Realty and Springleaf.[1] To reiterate, I found that the lease obligated Mizzou Realty to perform preventative, semi-annual maintenance to the HVAC system and Springleaf to perform day-to-day maintenance. In briefing the instant motions, the parties agree that contract law governs Plaintiffs' remaining claim, but disagree on its application.

"A breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." Keveney v. Missouri Military Acad., 304 S.W.3d 98, 104 (Mo. banc 2010)(citing Howe v. ALD Servs., Inc., 941 S.W.2d 645, 650 (Mo. App. 1997)). With regard to the final element, Missouri law imposes a causation requirement on the recovery of damages. Monarch Fire Prot. Dist. of St. Louis Cty., Missouri v. Freedom Consulting & Auditing Servs., Inc., 678 F. Supp. 2d 927, 941-42 (E.D. Mo. 2009). Here, there is no dispute with regard to the first element. Analysis will, therefore, focus on the remaining three.

The second element requires Mizzou Realty to have performed its duties under the lease.[2] As stated above, the lease obligated Mizzou Realty to perform preventative, semi-annual maintenance on the HVAC system. The parties have stipulated that Mizzou Realty never hired a contractor or any firm or person to service or inspect the furnace (Stipulated Fact 26).

---

[1] This case involves the actions of a landlord (Mizzou Realty Company, a non-party to this lawsuit), tenant (Defendant Springleaf Financial Services, legal successor to American General Financial Services, Inc.), employee (Plaintiff David Hodge who worked for American General Financial Services) and the employee's wife (Plaintiff Patricia Hodge). As its legal successor, Defendant Springleaf assumed American General Financial Service's rights and obligations under the lease agreement. Given this legal status and to avoid confusion, both entities will be referred to as "Defendant Springleaf" for purposes of this Order.

[2] As assignees, Plaintiffs stand in the shoes of Mizzou Realty.

Plaintiffs, instead, first argue that "Springleaf and Mizzou Realty have performed under the lease in accordance with an interpretation that Mizzou Realty was not obligated under the lease to service or maintain the HVAC system every six months."   This argument is unavailing.   "A course of performance by the parties to a contract which tends to show an interpretation by either one or both parties contrary to the plain terms of the contract does not control, but rather the contract is construed as written."   Acetylene Gas Co. v. Oliver, 939 S.W.2d 404, 409 (Mo. App. 1996)(citing Leggett v. Missouri State Life Ins., 342 S.W.2d 833, 877 (Mo. banc 1960); L&K Realty v. R.W. Farmer Constr. Co., 633 S.W.2d 274, 278 (Mo. App. 1982)).   The plain terms of the lease provide that Mizzou Realty "shall engage" a reputable HVAC contractor to service and maintain the HVAC system every six months.   As a result, the Court must construe the lease as written.

Similarly unavailing is Plaintiffs' waiver argument.   "Waiver is the intentional relinquishment of a known right.   If a waiver is implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right."   O'Connell v. Sch. Dist. of Springfield R-12, 830 S.W.2d 410, 417 (Mo. banc 1992). "To rise to the level of a waiver, the conduct 'must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of [the] conduct is possible.'" Acetylene Gas, 939 S.W.2d at 409 (quoting Waterwiese v. KBA Constr. Managers, Inc., 820 S.W.2d 579, 585 (Mo. App. 1991)).   Plaintiffs maintain that "both at the time the dislodged flue pipe was discovered and after, Springleaf hired and paid for the contractor to service and maintain the furnace without attempting to place such obligation on Mizzou Realty or even

contact Mizzou Realty regarding that maintenance." This conduct does not rise to the level required of an intentional waiver. Rather, it is just as likely that Springleaf's actions were performed in accordance with its duty under the lease to provide day-to-day maintenance to the HVAC system. Plaintiffs also maintain that Springleaf was aware Mizzou Realty never hired a contractor to service and maintain the unit by virtue of never having received a bill for such, yet never contacted Mizzou Realty to do so. While this is true, Springleaf never took on this duty itself. Furthermore, the lease contains a provision specifically dealing with the effect of a waiver.[3] This element has not been satisfied.

Even having found that Plaintiffs did not meet the second element, I find it prudent to analyze the remaining two. The evidence of record demonstrates that Springleaf did breach the terms of the lease that obligated it to perform day-to-day maintenance on the HVAC system. Although Defendant argues an absence of proof on this element, the undisputed facts show Springleaf did not change the filters to the furnace during the relevant period (Stipulated Fact 62, Uncontested Facts 5, 11, 17) and failed to repair the thermostat that was not working properly (Stipulated Facts 19, 21, 27).

The fourth and final element requires proof that Springleaf's breach was a cause of Mizzou Realty's damages. Plaintiffs argue that had Springleaf performed maintenance on the HVAC system as required, it would have discovered the dislodged flue pipe thereby preventing

---

3 Paragraph 23 provides:
        **EFFECT OF WAIVER.** No waiver of any condition or covenant of this Lease or the breach of any condition or covenant shall be taken to constitute a waiver of any subsequent breach of such condition or covenant, or to justify or authorize a non-observance on any occasion of the same or any other condition or covenant hereof, nor shall the acceptance or rent by Landlord at anytime when Tenant are in default or Landlord's right to terminate this Lease on account of such default.

the damages Mizzou Realty sustained.   There is no evidence, however, as to when the flue pipe became dislodged.   Both Mizzou Realty and Springleaf had maintenance obligations under the lease.   I am unable to determine which entity could have discovered it first and conclude that both had equal opportunity.   Plaintiffs have the burden to prove their case by a preponderance of the evidence; that is, more likely true than not true.   Because I cannot conclude that is more likely true than not true that Springleaf's failure to perform day-to-day maintenance on the HVAC system was a cause of Mizzou Realty's damages, Plaintiffs did not meet their burden. See Smith v. United States, 557 F. Supp. 42, 51 (W.D. Ark. 1982).

IX.    **CONCLUSION**

Consistent with the analysis set forth above, it is

ORDERED that Plaintiffs' second motion for summary judgment is denied.   It is further

ORDERED that Defendant's second motion for summary judgment is granted.   It is further

ORDERED that Plaintiffs' motion to amend their complaint to request costs and attorneys' fees (Doc. No. 58) is denied as moot.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 28, 2016